Aqui McKeithen 39607-068
Name and Inmate Booking Number

FCI FORT DIX
Place of Confinement

P. O Box 2000
Mailing Address

Joint Base/MDL NJ 08640
City, State, Zip Code

RECEIVED
FILED                    SERVED ON
ENTERED    COUNSEL/PARTIES OF RECORD

NOV 20 2023

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
                                    DEPUTY

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

Aqui McKeithen                    ,
                    Plaintiff

vs.

(1)  MS Fergerson            ,
(2)  MS Jones                ,
(3)  Samantha Tsui           ,
(4)  Sergeant Freeman        ,
(5)  C.D. Swann              ,
                    Defendant(s).

see additional pages for defendants

Case No. 2:23-CV-01691-JAD-DJA
(To be supplied by Clerk of Court)

**CIVIL RIGHTS COMPLAINT**
**BY AN INMATE**

☒ Original Complaint
☒ First Amended Complaint
☐ Second Amended Complaint

☐ Jury Trial Demanded

### A.   JURISDICTION

1)   This Court has jurisdiction over this action pursuant to:
☒ 28 U.S.C. § 1343(a)(3); 42 U.S.C. § 1983
☒ 28 U.S.C. § 1331; *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971)
☐ Other: _____

2)   Institution/city where Plaintiff currently resides: FCI FORT DIX

3)   Institution/city where violation(s) occurred: Nevada Southern Detention Center

6.) Defendant : Unknown Name, Head Nurse at NSDC Capacity Individual and official

7.) Defendant : Unknown Name position receptionist at NSDC Capacity Individual and Official

8.) Defendant : Unknown Name position Warden at NSDC Capacity Individual and official

9.) Defendant Dr Landsman position Doctor at NSDC Capacity Individual and official

10.) Defendant Ms Sherry position Nurse NSDC Capacity Individual and official

11.) Defendant Fletcher position Nurse Case Manager at NSDC Capacity Individual and official

12.) Defendant Unknown Male officer Employed as Correctional officer at NSDC Capacity Individual

I-A

## B.    DEFENDANTS

1.  Name of first Defendant: MS Fergerson (FNU). The first Defendant is employed as:

NSDC Capacity Individual at    Counselor                        .

(Position of Title)    Official                    (Institution)

2.  Name of second Defendant: (FNU) Ms Jones  The second Defendant is employed as:

Correctional officer        at  NSDC capacity Individual

(Position of Title)              (Institution)    Official

3.  Name of third Defendant: MS Samantha Tsui (FNU) The third Defendant is employed as:

Nurse                        at  NSDC capacity Individual, Offi

(Position of Title)              (Institution)    Official

4.  Name of fourth Defendant: Freeman (FNU). The fourth Defendant is employed as:

Sergeant                    at  NSDC capacity Individual

(Position of Title)              (Institution)

5.  Name of fifth Defendant:  Swann (FNU) . The fifth Defendant is employed as:

Correctional officer        at  NSDC capacity Individual

(Position of Title)              (Institution)

**If you name more than five Defendants, answer the questions listed above for each additional Defendant on a separate page.**

## C.    NATURE OF THE CASE

Briefly state the background of your case.

Plaintiff, a federal prisoner brings this action under title 42, United States Code section 1983 and Bivens, alleging deliberate indifference to a serious medical need in violation of the 8th amendment of the United States Constitution and retaliation in violation of the First Amendment of the United States Constitution.

2

6.) Defendant Warden  Employed as Warden at NSDC Capacity Individual

7.) Defendant Fletcher  Employed as Unit Manager at NSDC Capacity Individual

8.) Defendant  Unknown Male officer Employed as Correctional Officer at NSDC Capacity Individual

9.) Defendant Unknown Female Receptionist Employed as Receptionist at NSDC Capacity Individual

10.) Defendant Sherry  Employed as Nurse at NSDC Capacity Individual

11.) Defendant Dr Landsman Employed as Doctor at NSDC Capacity Individual

12.) Defendant Unknown Male Nurse Employed as Head Nurse at NSPC Capacity Individual

2-B

**D.    CAUSE(S) OF ACTION**

**CLAIM 1**

1.  State the constitutional or other federal civil right that was violated: first & 8th amendment of United States Constitution was violated

2.  **Claim 1**.  Identify the issue involved.  Check **only one**.  State additional issues in separate claims.

    ☐ Basic necessities        ☒ Medical care          ☐ Mail

    ☐ Disciplinary proceedings  ☐ Exercise of religion    ☐ Property

    ☐ Access to the court       ☐ Excessive force by officer  ☐ Retaliation

    ☐ Threat to safety          ☐ Other: _____.

3.  **Date(s) or date range** of when the violation occurred: 10 | 18 | 2021 .

4.  **Supporting Facts**: State as briefly as possible the FACTS supporting Claim 1.  Describe exactly what **each specific defendant (by name)** did to violate your rights. State the facts clearly in your own words without citing legal authority or argument.

    ... on the way. He ... on the ground he ... officer put him in ... station. Then sat ... mins no medical treatment at all.

    to go to hospital ... examined. Another ... unit to ... will see him Monday morning ... point.

    See Memorandum

## CLAIM 2

1.  State the constitutional or other federal civil right that was violated: _first 3  8th_
    _amendment of US Constitution was Violated_

2.  **Claim 2.** Identify the issue involved. Check **only one**. State additional issues in separate claims.

    ☐ Basic necessities     ☐ Medical care     ☐ Mail

    ☐ Disciplinary proceedings     ☐ Exercise of religion     ☐ Property

    ☐ Access to the court     ☐ Excessive force by officer     ☑ Retaliation

    ☐ Threat to safety     ☐ Other: _____.

3.  **Date(s) or date range** of when the violation occurred: _10/18/21_ .

4.  **Supporting Facts**: State as briefly as possible the FACTS supporting Claim 2. Describe exactly what **each specific defendant (by name)** did to violate your rights. State the facts clearly in your own words without citing legal authority or argument.

    _See memorandum_

4

### E.    PREVIOUS LAWSUITS

1.  Have you filed any other lawsuits while incarcerated?         □ Yes    ☑ No

2.  Has this Court or any other court designated you as subject to "three strikes" under 28 U.S.C. § 1915(g)?         □ Yes    ☑ No

3.  If you have "three strikes" under 28 U.S.C. § 1915(g), does this complaint demonstrate that you are "under imminent danger of serious physical injury?"         □ Yes    □ No

### F.    REQUEST FOR RELIEF

I believe I am entitled to the following relief: I am seeking punitive damages in the amount of 5 million n dollars and compensatory damanges in the amount of 8.5 million dollars and whatever else this court/jury finds reasonable, plus cost of this lawsuit and lawyer fees if deemed appropriate

I understand that a false statement or answer to any question in this complaint will subject me to penalties of perjury. **I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.** *See* 28 U.S.C. § 1746 and 18 U.S.C. § 1621.

Ashley Wallace

(name of person who prepared or helped prepare this complaint if not the plaintiff)

Aqui McKeuthen

(signature of plaintiff)

11/15/23

(date)

### ADDITIONAL PAGES

You must answer all questions concisely in the proper space on the form. Your complaint may not be more than 30 pages long. It is not necessary to attach exhibits or affidavits to the complaint or any amended complaint. Rather, the complaint or any amended complaint must sufficiently state the facts and claims without reference to exhibits or affidavits. If you need to file a complaint that is more than 30 pages long, you must file a motion seeking permission to exceed the page limit and explain the reasons that support the need to exceed 30 pages in length.

Aqui McKeithen
Reg. No. 39607-068
P.O. Box 2000
Joint Base/MDL NJ 08640

## MEMORANDUM IN SUPPORT OF TITLE 42 U.S.C. SECTION 1983 AND BIVENS COMPLAINT

Acqui McKeithen
    Plaintiff

vs:

Doctor Landsman ("Landsman") a Doctor
    at Nevada Dentention Center ("NSDS") in
    his individual and official capacity;
Unknown Name Correctional Office ("Unknown Male Officer")
    at ("NSDC") in his individual and official capacity;
(Unknown Name Nurse)("Unknown Male Nurse") Head
    Nurse at NSDC in his individual and official capacity;
Ms. Sherry ("Sherry") Nurse at NSDC in her individual
    and official capacity;
RN Samantha Tsui ("Tsui") at ("NSDC")
    in her individual and official capacity;
Unknown female Nurse ("Unknown female Nurse") at
    ("NSDC") in her individual capacity;
Unknown Female Receptionist ("Unknown Female Receptionist")
    at ("NSDC") in her individual and official capacity;
Ms. Jones ("Jones") Correctional Officer at ("NSDC")
    in her individual and official capacity;
Unknown name Correctional Officer ("Unknown Male Officer")
    at ("NSDS") in his individual and official capacity;
Mr. Swann ("Swann") Correctional Officer at ("NSDC") in his
    individual and official capacity;
Ms. Freeman ("Freeman") a Sergeant ("NSDC") in her
    individual and official capacity;
Ms. Furgerson ("Furgerson") Unit Counselor at ("NSDC")
    in her individual and official capacity;
Ms. Fletcher ("Fletcher") Unit Manager at ("NSDC")
    at her individual and official capacity;
Warden ("Warden") Warden at ("NSDC") in his individual
    and official capacity

    Defendants

## NATURE OF ACTION

Plaintiff, a federal prisoner, brings this action under Title 42, United States Code, Section 1983 and Bivens, alleging deliberate indifference to a serious medical need in violation of the 8th Amendment of the United States Constitution and retaliation in violation of the First Amendment of the United States Constitution.

## JURISDICTION AND VENUE

This complaint and jurisdiction arise from a civil action for deprivation of rights secured by the United States Constitution, as established in Title 42, United States Code Section 1983 and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

As set forth in more detail below, for purposes of plaintiff's Section 1983 and Bivens claims, Plaintiff timely exhausted the administrative remedies as required by the prison litigation reform Act 42 U.S.C. 1997e, and the NSDC Administrative remedy program.

Alternatively, agents or employees of NSDC frustrated plaintiff's attempts to completely exhaust his administrative remedies in this action, making administrative exhaustion futile. Defendants should therefore be stopped from asserting lack of exhaustion as an affirmative defense.

**PARTIES**

Plaintiff, Aqui McKeithen (39607-068), is currently residing at FCI Ford Dix located at Post Office Box 2000 Joint Base MDL, NJ 08640.

Plaintiff was housed at Nevada Southern Detention Center ("NSDC") which occurred on or about September 21, 2021, to on or about December 1, 2021. NSDC is located at 2190 E. Mesquite Rd., Pahrump, Nevada 89640.

At all relevant times herein, defendant Dr. Landsman; Nurse Sherry; Unknown male correctional officer; unknown head Nurse, RN Samantha Tsui; Correctional Officer Swann; Unknown female nurse: Correctional officer Ms. Jones; Unknown male Correctional officer; Case manager Fletcher; Unit Counselor Furgerson; Sergeant Freeman; unknown female receptionist; and the Warden, in their individual and official capacities under the color of state and federal law during the commission of the United States Constitution violation alleged herein in this Memorandum.

At all the relevant times herein, defendant Landsman was and upon information and beliefs, continues to be employed by NSDC as a Doctor.

At all the relevant times herein, defendant Ms. Fletcher was and upon information and belief, continues to be employed by NSDC as a unit manager.

At all the relevant times herein, defendant Ms. Sherry was and upon information and beliefs, continues to be employed by NSDC as a nurse.

At all the relevant times herein, defendant Ms. Furgerson was and upon information and beliefs, continues to be employed by NSDC as a counselor.

3

At all the relevant times herein, defendant Ms. Jones was and upon information and beliefs, continues to be employed by NSDC as a correctional officer.

At all the relevant times herein, defendant Tsui was and upon informatin and beliefs, continues to be employed by NSDC as a nurse.

At all the relevant times herein, defendant Freeman was and upon information and beliefs, continues to be employed by NSDC as a Sergeant.

At all the relevant times herein, defendant Swann was and upon information and beliefs, continues to be employed by NSDC as a correctional officer.

At all the relevant times herein, defendant unknown name male officer was and upon information and beliefs, continues to be employ by NSDC as a correctional officer.

At all the relevant times herein, defendant unknown name head nurse was and upon information and beliefs, continues to be employed by NSDC as a nurse.

At all the relevant times herein, defendant unknown name male officer was and upon information and beliefs, continues to be employed by NSDC as a correctional officer.

At all the relevant times herein, defendant unknown name head nurse was and upon information and beliefs, continues to be employed by NSDC as a nurse.

At all the relevant times herein, defendant unknown name male officer was and upon information and beliefs, continues to be employed by NSDC as a correctional officer.

4

At all the relevant times herein, defendant unknown name receptionist was and upon information and beliefs, continues to be employed by NSDC as a receptionist.

At all the relevant times herein, defendant unknown name female nurse was and upon information and beliefs, continues to be employed by NSDC as a nurse.

At all the relevant times herein, defendant Warden was and upon information and beliefs, continues to be employed by NSDC as a Warden.

## 1. FACTUAL BACKGROUND

1. While McKeithen was at Nevada Southern Detention Center ("NSDC"), the defendants showed deliberate indifference to his serious medical conditions in violation of the Eighth Amendment of the United States Constitution. Wherein Plaintiff was denied proper medical treatment for head and face injury, hairline fracture, broken nose, an incision on the left eyebrow, a puncture wound on the upper lip, and a scar under his left eye.

2. McKeithen has been incarcerated since January 10, 2019. Plaintiff was transferred to NSDC, which is located at 2190 E. Mesquite Avenue, Pahrump, NV 89606, on or about September 21, 2021. He had been fully vaccinated for the Corona Virus.

3. McKeithen arrived at NSDC where he had to undergo a screening process. It proves that every individual had to go through upon entering the prison. McKeithen states that inmates sat in a holding cell.

4.    McKeithen states that inmates were held in a holding cell and taken out in groups of three. Plaintiff and two other idividuals were taken out of the holding cell and proceeded to talk with correctional officers, wherein Plaintiff and the other inmates were asked certain questions and given information.

5.    McKeithen and other inmates had their pictures taken. McKeithen was then directed to speak with one of the nurses employed by NSDC. McKeithen states this was done by the prison's medical screening area where inmates would get tested for the Covid-19 Virus. Inmates would tell the nurses about other medical conditions the person might have.

6.    McKeithen states that he was seen by a Latin American nurse wearing glasses, who was unknown to him at the time of the screening. McKeithen believes that the nurse's name was Marie. On several occasions after the screening the nurse came to McKeithen's housing unit (G1) and they spoke to one another.

7.    McKeithen states that during his screening process he spoke about multiple health problems that he was experiencing, which he believed qualified him to have a bottom bunk. McKeithen states that he let the nurse know he took Depakote for seizures and depression.

8.    McKeithen further states that he let the nurse know that he sometimes stops breathing while he sleeps (apnea) and this causes McKeithen to wake up violently. McKeithen states he also let the nurse know that he suffered severe damages from a gun shot wound to the left leg where McKeithen never received physical

6

therapy. McKeithen let the nurse know too that he had a umbilical hernia. The nurse told McKeithen that she would document everything so that he could get a bottom bunk.

9. McKeithen states that after leaving the medical station he and about twelve other inmates did not have to go to the quarantine unit because they were vaccinated for the Covid-19 virus. McKeithen states that he was sent to unit (G1) and assigned an upper bunk (34A).

10. McKeithen states that he was concerned with his bunk assignment after everything he had told the nurse. McKeithen states that he was told by other inmates that he should see Unit Manager Fletcher in the morning. McKeithen states that he is not sure if Unit Manager Fletcher came in the next morning. McKeithen states, however, that he saw Counselor Furgerson the next morning and told her about his health conditions and explained why he could not be on upper bunk.

11. Unit Counselor Furgerson stated that she did not have the power to authorize bed movements and that McKeithen should have told the medical staff when he arrived. McKeithen told counselor that he had told the nurse who said that she was going to do everything that she could do for McKeithen to get him a bottom bunk.

12. Unit Counselor Furgerson stated to McKeithen that he would have to talk to the medical department about a bottom bunk crownal, she further stated that other

than Unit Manager Fletcher, only the medical department could give authorization to move McKeithen to the bottom bunk.

14. McKeithen further told Unit Manager Fletcher that he has an umbilical hernia. McKeithen states that Unit Manager Fletcher said, "Everyone wants to be moved to a bottom bunk. I'm not doing any moves this week. There are people who have put in request slips for a bottom bunk change that I have to deal with before I can move you." Unit Manager Fletcher stated that McKeithen needed to write a request slip to medical for a bottom bed crownal since he had already told medical he had these medical problems. She stated that, "I will move you as soon as I'm notified by medical."

15. McKeithen states that he saw the nurse come to his unit later that week. McKeithen spoke with the nurse, who showed surprise that he was not on a bottom bunk. She stated that she would let the doctor know about McKeithen's medical conditions and that she had documented everything McKeithen told her about his health. McKeithen stated the nurse said she did her job and that it is now up to tohe doctor to give him a bottom bunk crownal. She instructed McKeithen to keep writing to the medical department.

16. McKeithen states on or about Sunday night of October 18, 2021 at approximately 4:09 a.m., McKeithen got out of the bed to use the restroom. As he went to use the urinal, McKeithen blacked out and fell backwards, smacking his head directly on the concrete floor. The sound of McKeithen smacking his head on the floor was

8

loud enough to wake some people from their sleep. Further, a few people were up at the time of the incident and witnessed McKeithen blacking out.

17. These witnesses, who had watched this incident unfold, later told McKeithen they witnessed, including how McKeithen had blacked out and hit the back of his head on the concrete floor, then fell forward, hitting his head on the metal urinal. Thereafter, McKeithen laid on the ground having a seizure. At that point an Unknown Correctional Officer came on the scene. McKeithen states that he woke up to find people standing around him and the Unknown Officer saying, "Don't move, I got you. Help is on the way." The next thing McKeithen remembers is being put into a wheelchair and people crowding around him.

18. McKeithen was then transferred to the nurse's station by a female African American nurse whose name McKeithen did not know. McKeithen arrived at the nurse's station, where he sat for fifteen minutes while bleeding profusely from his face and head. No medical treatment was provided at that time. McKeithen states that he overheard the African American nurse saying that McKeithen needed to go to the hospital to get stitches for his head to be examined because he hit his head twice. Shortly thereafter, whose name McKeithen did not know, but stated that she was an unknown Asian American nurse saying, "We're going to clean his face and send him back to his unit to lay down."

19. The Asian American nurse stated to McKeithen that a doctor would be in on Monday to see him about his accident. McKeithen repeatedly asked about his

9

face, requested stitches, and to be taken to the hospital "to get my head examined." The unknown Asian American nurse, however, became mean and disrespectful and reiterated that they were taking McKeithen back to his housing unit and he could see the doctor on Monday morning. McKeithen states that before he was returned to his unit thenurse applied some "butterfly" tape and gauze pad to one of his wounds. He was given no medication to help with severe pain he was experiencing. Nor did anyone clean the wounds on his face to keep him from getting any type of infection.

20. McKeithen was then transported back to his housing unit (G1) where he was told to lay in his bunk, despite complaining about excruciating pain to his face and head. McKeithen states that several inmates came to his bunk and told McKeithen he should not lie down. A short time later, the Unit Officer came and told McKeithen that he needed to go back to medical because "you need to go to the hospital. You're not supposed to be laying back down after a head injury, especially how you just hit yours." The Officer got McKeithen out of his bunk and then called the medical department. Thereafter, McKeithen was returned to the nurse's station.

21. McKeithen states that it was a male African American Officer who helped him return back to the nurse's station. Still McKeithen received no medical care at the nurse's station. After twenty minutes had passed, McKeithen asked to use the restroom. McKeithen states that a female African American receptionist whose

10

name McKeithen did not know, looked at him and shook her head, then she said, "God bless you! You get to the hospital." McKeithen entered the restroom, it was the first time that he actually saw the damage that had been done to his face. McKeithen was shocked by his appearance and wondered why he was not taken immediately to the hospital. The damage that he suffered was evident and showed that he needed further medical treatment.

22. McKeithen states that after using the restroom, a male Caucasian head nurse placed McKeithen in a cell near the nurse's station. The nurse stated that the doctor would be at 9:00 a.m. The nurse gave McKeithen one pill for the severe pain he was experiencing. McKeithen was scared of what might happen to him if he fell asleep as nobody was around to monitor his well being. McKeithen states that in the past he was told not to lie down after falling and hitting his head. However, the affect of the medication over-powered his body and made him drowsy.

23. McKeithen states that he fell asleep. A couple hours later, after taking the medication, the same nurse gave him another pill. McKeithen asked the nurse when the doctor was going to examine him. McKeithen states that the nurse said that McKeithen should be in the hospital. McKeithen asked the nurse why was he locked away in a cell like he was being hidden. The nurse told McKeithen the doctor would be in soon to see him. McKeithen states that he went back to sleep for what felt like a couple hours. McKeithen woke up to find a female correctional

officer whom McKeithen thinks was named Ms. Jones, and who was an African American. McKeithen asked her if she had a commissary list so that he could purchase medication and if he could use the telephone. McKeithen states that he wanted to call his mother to let her know what was going on with him.

24. McKeithen states that the correctional officer came back with an orange cordless phone. McKeithen then called his mother. His mother became frantic when she learned about what had happened to McKeithen. She was also upset that she was not notified by the facility as she was McKeithen's emergency contact. McKeithen states that he asked correction officer when would the doctor see him? The correction officer told McKeithen that the doctor did not come in that day but would be in the next day. She then stated that it is wrong for them not to send you to the hospital and that she felt bad for McKeithen's situation.

25. McKeithen states that he went the whole day without any pain medication or medical treatment. The correction officer brought him food to eat. Later that night, McKeithen states that the correctional officer said that she wished him the best and hoped that they took him for treatment at a hospital. Thirty-four hours after his fall, McKeithen was seen by NSDC Doctor Landsman, who shined a light into McKeithen's eyes. The doctor stated that when he was a younger man, soldiers in a foreign military would fall and mess their faces up like McKeithen had done. The doctor then proceeded to flash a pen light into McKeithen's eyes.

26. Doctor Landsman stated that McKeithen did not have a concussion and that he did not need stitches for his face as it would heal perfectly. Doctor Landsman told him that he was cleared to go back to his housing unit. This occurred on or about 12:30 p.m. on Tuesday, October 21, 2021. McKeithen states that he was not returned to his unit until about 7:30 p.m. A nurse who was working the nurse's station the night of McKeithen's incident repeatedly told McKeithen that he could not leave until the lieutenant cleared him to go back to his unit. McKeithen states that during the time he was in the nurse's station, the staff seemed like they had done something wrong by not sending him to the hospital and were reluctant to send McKeithen back to his housing unit.

27. McKeithen states that the next morning, Wednesday, October 22, 2021, he went to the video station to have a virtual visit with his mother and brother. During that visit they took pictures of his face. On or about October 23 or 24 McKeithen saw Unit Manager Fletcher who said, "Oh my god, McKeithen, ook at your face, McKeithen." Ms. Fletcher and McKeithen discussed the situation that had occurred, Ms. Fletcher expressed her sympathy about what had happened and even asked McKeithen if medical staff had cleaned his face because it did not look like it to her. She further stated, "You need to go to the hospital, you need to see medical again."

28. Later that same evening, while at the medication line, which is conducted on the housing unit every night, McKeithen finally got to see the nurse who had helped

13

him return to his unit. McKeithen asked the nurse if he had been prescribed ibuprofen or Tylenol. McKeithen states that the nurse subsequently gave him his medication. Thereafter, the nurse pulled McKeithen to the side and stated that she was the one who had taken him to the nurse's station in the wheelchair the night he had blacked out and told staff members that McKeithen needed to go to the hospital.

29. The nurse stated to McKeithen that something needed to be done about the facility not taking him to a hospital and that it was wrong how they treated him. McKeithen states that the nurse said she did not want to be in the middle of the situation with McKeithen not getting proper medical treatment.

30. Later that week, McKeithen began waking up with migraine headaches. McKeithen states he asked Correctional Officer Swann if he could call the nurse and tell the nurse that McKeithen needed some pain medication for his migraine headaches. McKeithen states that Correctional Officer Swann said, "What do you want me to do about your medical problems? I have other things to worry about. Write a sick call slip or wait until medication line tonight." McKeithen states that he asked Officer Swann again if he could call medical. McKeithen states that Officer Swann just looked at him and walked off.

31. McKeithen states that on or about the last week of October he went and saw Ms. Furgerson, the Unit Counselor. McKeithen states he asked her to call medical because he felt something was not right with how he was feeling. He believed that

14

he should be taken to the hospital to get his head examined. McKeithen states that Unit Counselor Furgerson brushed him off by stating that she had other things to take care of and that the (G1) unit is not the only unit she had to check on. She told McKeithen to write a sick call slip or have the Unit Officer call medical. She stated that she had to go over to housing unit (G2) and that McKeithen whould take his medical problems up with the medical department when he saw them. McKeithen states that Unit Counselor Furgerson never came back to the housing unit that day.

32. During the first week of November, McKeithen was at the front of the housing unit for the morning medication line when a nurse asked McKeithen how he was doing. She stated that she was in the nurse's station when McKeithen was brought there on the night of the incident. The nurse stated that McKeithen was very badly hurt. And that she had told the head nurse and other nuses that McKeithen needed to be taken to the hospital. Then the nurse stated in jovial manner that, "I'm only a nurse that works here but what do I know?" McKeithen then asked the nurse her name and she stated that it was Ms. Sherry and that she did the a.m. morning medication line almost every morning.

33. McKeithen continued to fill out grievance forms about his medical condition and sent them up the chain of commands. McKeithen asked why he was not sent to the hospital and was not getting any medical treatment. He also asked why he had been seen only once by Doctor Landsman which was almost a day and a half after

15

McKeithen blacked out and why he had not been given any type of treatment after the incident.

34. On or about the first week of October, McKeithen was called to the nurse's station for a follow-up by Doctor Landsman. First McKeithen had his weight taken by an Asian American nurse. McKeithen was then seen by Doctor Landsman who asked McKeithen about his history with seizures. McKeithen told Doctor Landsman that in the past he ahd (absent) seizures on occasion and he had a grand mal seizure at the age of seventeen. McKeithen stated to the doctor that he believed that when he blacked out and hit the floor he suffered another grand mal seizure but he never experienced it as strongly as what had just happened to him.

35. McKeithen told Doctor Landsman that he was having problems remembering things that happened before he fell, that personal things were in a different place and upon waking up he suffered from migraine headaches. Further, he stated that he felt light-headed often and that he was having problems that he had never experienced before. Doctor Landsman told McKeithen that he was dealing with issues that people often deal with after suffering a head injury. McKeithen also told Doctor Landsman that his mother had suffered seizures from 1999 to 2009.

36. Doctor Landsman told McKeithen that he had a broken nose that looked like a hairline fracture. McKeithen then asked the doctor, if he had a broken nose, didnn't he need to go to a hospital to get stitches for his upper lip, eyebrow and face and to get his head checked out for concussion protocols. Doctor Landsman

16

told McKeithen he used to work in the hospital and that he knokws what is best. The doctor said that he saw falls like this all the time, you'll be okay, you just fell. I'm going to prescribe a seizure medication for you."

37.  About three weeks after the incident, McKeithen was lying in his bed for official count being done by Sergeant Freeman and another Unknown Officer. Sergeant Freeman looked down to where McKeithen was lying on his bed and told him he needs to be standing for count. About one hour later McKeithen was called to the front of the unit by Sergeant Freeman who said that she needed McKeithen to come with her. Sergeant Freeman said that she needed McKeithen to make a statement about what happened to his face. McKeithen stated that he had blacked out and fell. He stated that medical department already had a report of what had happened.

38.  Sergeant Freeman stated to McKeithen that, "I have to look into this incident with your face looking like that. I have to do this because its part of my job, especially when someone looks like they were in a fight. I have to report the injuries. You can clearly see them on your face." While McKeithen and Sergeant Freeman sat at the nurse's station, Sergeant Freeman started asking the the nurses who were present at the time, did anyone know about McKeithen's fall? Ms. Jones, a Correctional Officer, was present at the time and told Sergeant Freeman that McKeithen had blacked out. McKeithen then asked Sergeant Freeman if she could do something about him going to the hospital. Sergeant Freeman stated that is out

of her hands. Then said, "Anyway, you don't want to go to the hospital out here. I heard the treatment is horrible." She also stated to McKeithen that he needed to talk to head of the medical department because the situation was out of her hands.

39. McKeithen states that he would constantly complain to the Unit Manager, Ms. Fletcher, who ask if the medical department said anything about his incident. Ms. Fletcher then said, "Look at your face, McKeithen, did they even clean it? You need to go to the hospital to make sure there is nothing wrong with your head." McKeithen states that this was three weeks after the fall. Ms. Fletcher also stated to McKeithen that there was a team meeting and that McKeithen's medical needs were brought up. However McKeithen never saw anybody or heard anything after Ms. Fletcher mentioned the team meeting. McKeithen received and came back about why he never was taken to a hospital to get examined. The answer denied that McKeithen had received inadequate medical care. So McKeithen took the next step which was to appeal the decision.

40. On or about November 04, 2021, McKeithen states he was waiting on an answer to his appeal when the Warden or Assistant Warden was doing a walk through. McKeithen stopped the Warden to talk with him about his medical problems and medical treatment he did not receive from the medical staff. The Warden told McKeithen that he had heard about the incident but did not know it was that serious. The Warden said that he was taking care of it until he saw McKeithen's face. He remarked about how seriously injured McKeithen's face was and that it

18

needed to be looked at. The Warden told McKeithen he would get back to him. On November 10, 2021, Doctor Landsman agreed that McKeithen needed to be taken to a specialist for further examination.

41.    McKeithen states that during the rest of November, he did not hear anything from the staff regarding him getting treatment. No followup treatment for his health condition was conducted. McKeithen states that on or about the last week of November, the Warden was doing another walk through and McKeithen asked him what was the status of the specialist consultation. That Warden told McKeithen that he would get back with him soon and let him know the status. McKeithen was then transferred from NSDC to Federal Correctional Institution Victorville on December 1, 2021.

## CONCLUSION

To redress plaintiff pain, suffering, other injuries and Constitutional violations, Plaintiff is respectfully requesting judgment in his favor against the Defendants for an amount in excess of $5,000,000 for Compensatory damages and $8,500,000 for punitive damages and or the amount the jury find to be reasonable, plus cost of this lawsuit and lawyer fees if deemed appropriate.

Dated: 11/15/23                                    lsl _Cagui McKeithen_

19